**In re ELDERCARE PROPERTIES, Debtor(s).**

No. 05–71283.

United States Bankruptcy Court, S.D. Texas, McAllen Division.

Oct. 12, 2006.

Eduardo V. Rodriguez, Malaise Law Firm, Brownsville, TX, Lance A. Kirby, Jones Galligan et al, Weslaco, TX, Michael J. Urbis, Jordan Hyden et al, Brownsville, TX, Shelby A. Jordan, Jordan Hyden Womble and Culbreth, PC, Corpus Christi, TX, for Debtor.

Barbara C. Jue, Office of U.S. Trustee, Corpus Christi, TX, Christine A. March, Office of the U.S. Trustee, Houston, TX, for U.S. Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD S. SCHMIDT, Bankruptcy Judge.

On this day came on for consideration the Amended Motion to Assume Non–Residential Real Property Lease and Objection to Proof of Claim and Request for Declaratory Relief and for Order Providing for any Cure Obligations, Damages, or Rights of Offsets and Credits to Establish Adequate Assurances of Future Performance (the "Motion"), filed by the Debtor, ElderCare Properties, Ltd. ("ElderCare"). The Court, having heard the evidence and arguments of counsel, makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

#### A. Introduction

1. Debtor is ElderCare, Ltd., acting as debtor in possession in its small business Chapter 11 ("Debtor" or "ElderCare"), having filed its Chapter 11 case on October 25, 2005.

2. Valley Educational Foundation, Inc. (hereinafter "VEF"), as Lessor, is the respondent in the Motion to Assume and the Defendant in this Objection to the Claim filed by VEF on lease-related damages.

3. VEF filed a proof of claim in this case, and within 30 days of such filing by VEF, the Debtor counter-claimed for the relief sought in this proceeding.

4. The Debtor filed its Motion to Assume this Real Property Lease pursuant to Section 365 of the Bankruptcy Code, and filed its counterclaim to the proof of claim of VEF.

5. This Court entered an Order finding among other things that this Motion and related contested matters were "core" proceedings, which facts set out therein are incorporated in these findings of fact as if fully set out herein.

6. The Debtor is requesting that this Court determine whether or not the Lease is assumable, the "cure" of any claimed default, the ability of the Debtor to give adequate assurances of performance in the future, taking into account any rights of offset for damages arising from the Debtor's allegation of VEF's various breach of the Lease.

7. In the event the Lease is found to have been terminated pre-petition, the Debtor seeks a judgment against VEF for the amount of overpayment of rent, damages for the breach of the Lease, and attorneys's fees.

8. VEF answered the Motion and the Counter-claim to its proof of claim, asserting the Lease was validly terminated pre-petition.

9. VEF further denies the breach of the Lease allegations of the Debtor and asserts several affirmative defenses including waiver, estoppel and statute of limitations. The Debtor replied by Supplemental Response to VEF's affirmative defenses.

10. This Court has jurisdiction over the Parties, the dispute, and this proceeding as previously found in a separate order.

11. The trial of this Contested Matter deals with:

i. a motion pursuant to Bankruptcy Code § 365 to assume an executory contract, which requires this Court to determine the obligation under the executory contract, and to determine if the contract is executory—each determination is a "core" proceeding appropriate as a contested matter.

ii. an objection to the proof of claim filed by VEF—a mandatory "core" proceeding appropriate as a contested matter.

iii. A demand for offset and recoupment, arising out of the same pre-petition transactions made the basis of the proof of claim, a "core" proceeding appropriate as a contested matter.

12. This contested matter proceeded under the Federal Rules of Civil procedure for the pretrial, including compliance with Rule 26a disclosures, the taking of all discovery and depositions.

13. The Court invoked the Adversary Rules of Procedure for the conduct of the pre-trial and trial of this case.

14. Debtor filed a Amended Motion to Assume the Lease of the premises owned by VEF (the "Lease") at which the Debtor operates its business.

15. The Debtor seeks to assume the Lease and to cure any default, if any are found.

16. The Debtor seeks to have its attorney's fees awarded in a subsequent proceeding.

**B. Background of the Parties**

17. VEF is a not for profit corporation owned by the Seventh Day Adventist Church ("SDA") and operated by a board of directors (the "Board"), a President, Secretary, and Treasurer appointed by ei-

ther the Texas Conference of SDA, or the Board itself.

18. All of the party-representatives are members of the SDA Church and the property and property rights involve SDA-owned property.

19. The SDA disciplines manual governing conduct of the SDA members provides that SDA members should not be involved in litigation among themselves. The Lease at issue was drafted with several provisions requiring "good faith" negotiations and even a form of binding mediation.

20. ElderCare's owner, Glen Hamel, was solicited by VEF to join the Board in the late 1980's as a result of operational difficulties with VEF's two nursing homes and one retirement center located in the Rio Grande Valley.

21. While Mr. Hamel was on the board, one of the nursing homes, and the retirement facility were sold, leaving only the "Valley Grand Manor" facility ("VGM") in Weslaco, Texas.

22. In 1991, VEF became concerned about its liability for directly operating a nursing home facility, and a wholly owned corporation was formed [Valley Grand Nursing and Convalescence Home Inc.] to which VEF transferred the operations as a Lessee.

23. In 1990, ElderCare Management Services was asked to take over the operations of VGM facility in Weslaco, and a management agreement was entered into and approved by the VEF Board.

24. Subsequently, near the end of 1995, VEF's Board voted to terminate the Lease it had with its wholly owned subsidiary Valley Grand Nursing Home and Convalescence, Inc. and enter into negotiations with the Debtor for a new Lease of the VGM facility.

25. Thereafter, negotiations were commenced between VEF and ElderCare.

26. The negotiations were arms-length and resulted in a written lease agreement (the "Lease").

27. The Lease was originally to last 10 years with an additional 30 years of options available.

28. In 1997, at the request of VEF, ElderCare agreed to renegotiate an addendum to the Lease to make the Lease period 20 years shorter.

## C. The Medicare and Medicaid Lease Provisions:

29. Historically, the operations of the nursing home prior to 1995 had received more than 85% of its revenue from Medicaid/Medicare.

30. A mandatory obligation to re-negotiate the "Basic Rent and/or Additional Rent" if changes occurred in reimbursement methodology was placed in the Lease as follows:

Section 2.07:

"Lessor recognizes that the primary source of revenue for the Facility is derived from residents from whom the payer source is either Medicaid or Medicare. Thus, should there be substantive changes and/or reductions in the way that Medicaid or Medicare and/or their successor programs reimburse the Facility for providing care, *the Lessor at the Lessee's request will enter into good faith negotiations with respect to the amount of Basic Rent and/or Additional Rent that is due and payable under the terms of this Lease Agreement."* [emphasis added]

31. A second provision dealing with the renegotiation of the "Basic Rent" was inserted at section 14.09 of the Lease:

No amendment, modification, or alteration of the terms of this agreement shall

be binding unless the same is in writing, dated subsequent to the date of this agreement, and duly executed by the parties to this agreement. However the Lessor and Lessee agree that should there be significant changes in the Medicare and/or Medicaid reimbursement methodology, both Lessor and Lessee will proceed in good faith to amend the terms of this Agreement in a manner that represents a reasonable accommodation of the interests of each party.

32. The parties to the Lease did not intend for section 14.09 to require re-negotiation of the entire Lease if significant changes in reimbursement methodology occurred, but re negotiation could involve matters other than rent, such as security deposits, tax escrows, and other non-monetary terms to protect the interests of both parties.

### D. Attempts to Negotiate Reduced Rent Based on Medicare and Medicaid Changes

33. Beginning in the year 2000, the State of Texas made changes to Medicaid reimbursement methodology.

34. The Texas Health and Human Services Commission, for the first time in the year 2000, departed from the Boren Amendment rate setting methodology which resulted in lower Medicaid rates than the rates that would have been set under the 1999 Boren Amendment methodology.

35. In May of 2000, the TDHS implemented the direct care staffing program which required nursing homes to spend at least 85% of their direct care staff reimbursement or the State would recoup Medicaid monies paid.

36. As a result of the changes in Medicaid reimbursement methodology, ElderCare began a series of presentations and communications with the VEF Board to illustrate the scope and extent of the program during the year 2000.

37. A presentation regarding changes in Medicaid Reimbursement methodology was made to the Board in June of 2000 and communication occurred between ElderCare and VEF during this time.

38. Following the meeting in June of 2000, another meeting took place on August 22, 2000, at which ElderCare invoked the Lease provisions of sections 2.07 and 14.09 and requested negotiation of a Lease rate reduction because of the changes in Medicaid reimbursement methodology.

39. At the meeting, ElderCare provided information to VEF reflecting how it believed the Medicaid changes would adversely impact their business.

40. At the meeting VEF requested additional Lease negotiations beyond the rent issue.

41. At the meeting, Mr. Eder rejected ElderCare's request to begin negotiations on the rent issue.

42. Following the August 22, 2000, meeting, a memorandum was sent to Eder reflecting the events of the meeting.

43. Mr. Hamel drafted the memorandum the day after the meeting and sent it immediately to Eder. Eder never denied receiving this memorandum, nor denied any of its contents as accurately reflecting what was stated by him in his meeting.

44. On August 22, 2000, Mr. Hamel requested a rent reduction in writing for the next 12 months to which VEF never responded, and Mr. Hamel again requested the parties go forward with good faith negotiations with respect to rent as called for by the Lease.

45. In response to these meetings and these multiple requests to negotiate the rent amount, the VEF Board met and

discussed the issue and passed a Resolution.

46. The Board of Directors Resolution appointed Errol Eder and Kelly McDonald (a lawyer) negotiators for ... "a new Lease Agreement or amendment with ElderCare ..."

47. The Board resolution instructed the negotiators on what must be included in the "new Lease or amendment" as follows:

"..understanding that the new document (i.e., the Lease Agreement or amendment) will contain the following issues that the board considers non-negotiable.

• Lessee's responsibility for payment of back, present and future property taxes.

• Provision for tax escrow deposit.

• Right of first refusal.

• No sublease allowed

• Cross default on payment of the remodeling Promissory Note.

• Default for non-full compliance with State and Federal regulations related with the business.

• If a provision for basic rent adjustment is needed, it must be reciprocal.

• Guaranties and warranties from lessee.

• Mandatory immediate report to lessor of any and all citations or survey results received by lessee from Federal, State and Local regulatory agencies. At lessee's costs, provide lessor with detailed financial statements on a quarterly basis as well as a year-end audited statement."

48. Following the board meeting and resolution, Kelly McDonald, as authorized representative for VEF, sent a letter to Glen Hamel on November 6, 2000, notifying Mr. Hamel that the VEF Board wanted additional attached provisions (consistent with the provisions required in the Board resolution) included in the Lease in the event the Lease was going to be modified.

49. Accompanying the receipt of the letter to ElderCare were twelve pages of new provisions and a six page personal guaranty for Glen Hamel to sign.

50. VEF required the provisions contained within Ms. McDonald's November 6, 2000, letter to be included in a new Lease or amendment before it would negotiate the rent amount.

51. ElderCare refused to be compelled to agree to the terms in order to be given the right to them attempt negotiations on the rent reduction.

52. Although ElderCare objected to the attempted re-negotiation of the entire Lease, Glen Hamel was also told orally by Ms. McDonald that the inclusion of these provisions in any new Lease would be required before rent reduction would be discussed.

53. In the summer of 2004, ElderCare began again to request re-negotiation of the Base Rent including retroactive reduction.

54. At the November 2004 Board meeting, ElderCare presented information about Lease rates on a per bed basis at other health care facilities in Texas. The Board meeting was an opportunity to begin discussions about Lease renegotiation. At the Board meeting, ElderCare, along with its expert Coyle Kelly, made a presentation regarding the Medicaid reimbursement methodology changes and the insurance problems.

55. At the meeting, the Board again appointed Kelly McDonald, as "our spokesperson with Glen Hamel about any questions he has in renegotiating the current Lease with ElderCare."

56. Following the November 2004 meeting, Ms. McDonald and Mr. Eder continued to require that ElderCare make the changes to the Lease previously presented before VEF would even discuss rent modifications based upon Medicaid changes.

57. No further attempts to negotiate base rent occurred following the November 2004 Board meeting.

58. During the years 2000 through 2005 there were changes to the Medicare reimbursement methodology, thereby obligating the parties to renegotiate the rent provisions of the Lease.

59. VEF failed to negotiate the rent amount in good faith as required by paragraph 2.07 and 14.09 of the Lease.

60. Such failure constitutes a breach of the Lease.

61. Using public information that is reported to the State of Texas, Coyle Kelly compiled average Lease rates per bed per month (which are reported to the State of Texas) for nursing facilities comparable to ElderCare's facility for the years 2000–2005. ElderCare relied on comparisons of average per bed, per month, rates to its own rates to support its claim for damages.

62. Despite the expert testimony, ElderCare did not provide proof of any specific cost increases or reimbursement decreases caused solely by changes in Medicaid reimbursement methodology nor did ElderCare provide any testimony on what the likely outcome of a properly negotiated rent decrease. The proper measure of damage for violation of the negotiations provision of the case must take into consideration the entire provision which requires any new negotiations take into account the "needs of the parties." Thus even if ElderCare had proven the exact dollar decrease in income or increase in expense care by changes in Medicaid methodology, such figure would merely be the beginning point of negotiations. Damages caused by the failure to negotiate are speculative.

### E. The Insurance Underwriting and Re–Negotiation Provisions

63. § 6.17 regarding GENCON states in a pertinent part:

"Notwithstanding anything to the contrary contained in this article, Lessor agrees that Lessee may use the Seventh Day Adventist captive insurance company, GENCON, to satisfy the requirements of this Article 6, provided however, that in the event Lessee desires to change GENCON as its insurance company, Lessee shall first obtain Lessor's written consent which shall not be unreasonably withheld."

64. Except for section 6.17, the Lease does not have any other provision requiring that VEF consent to or approve the insurance carrier or underwriter selected by ElderCare.

65. Provision 6.17 of the Lease does not have any other provision requiring that VEF consent to or approve the insurance carrier or underwriter selected by ElderCare.

66. Provision 6.17 is in the Lease because VEF wanted ElderCare to use GENCON.

67. Both parties believed GENCON was available for use by ElderCare.

68. ElderCare wanted GENCON for three reasons:

(i) Ease of access to the carrier with a common interest in insuring Church property and activities; and

(ii) cost savings as compared to non-captive insurance carriers.

(iii) guaranteed availability of liability insurance

69. After entering into the Lease, it was discovered that GENCON had made internal policy decisions and was no longer writing insurance for lessees of church facilities.

70. ElderCare was forced to go to the open market for insurance coverage and obtained insurance on the open market.

71. When insurance became difficult or economically impossible to obtain in year 2003, ElderCare again attempted to use GENCON to obtain liability insurance with VEF's assistance, but GENCON again refused.

### F. The Insurance Limits and Marketplace

72. During the years 2003–2004, and 2004–2005, over 50% of the nursing homes in Texas were wholly uninsured for medical malpractice claims.

73. Beginning in 1999, medical malpractice insurance coverage began to increase substantially in cost.

74. The limits required by the Lease became excessive as that term is used in Provision 6.16 during the year 2000.

75. The premiums for liability insurance rose from $53,550.00 in 1999 with $2,500.00 deductible for $4,000,000.00 in coverage, to over $1,050,000.00 with a $100,000.00 deductible for $1,000,000.00 in coverage in 2004.

76. As a result of increasing costs and lack of availability of coverage, ElderCare reduced its general and professional personal injury coverage below the requirements of the Lease during the latter part of the year 2000.

77. VEF received notice of the reduced coverage amount, but no objections for the years 2001, 2002, or 2003 were voiced by VEF.

78. In 2001, coverage was reduced to $ 1,000,000.00 with a premium of approximately $147,000.00 and again this policy was furnished to the auditors and VEF without objection.

79. In 2002, coverage stayed at $ 1,000,000.00 with a premium of $351,000.00 and again this policy was furnished to the auditors and VEF without objection.

80. In 2003, the quote for $1,000,000.00 in coverage was approximately $526,000.00 and the quote for $1 million coverage for 2004 was a premium of $1,050,000.

81. In addition to the increases in premiums and reduction in coverage, the deductibles increased from $100,000.00 in 2000, to $100,000.00 in 2002, for the same coverage and later required that the deductible be placed in a certificate of deposit or cash.

82. At the time the parties entered into the Lease, they could not have known that the insurance cost, deductibles, and reductions in coverage would changes so much in such a short period of time.

83. In early 2003, because of the inability to obtain malpractice insurance, ElderCare formed a wholly owned subsidiary, like VEF did in 1991, to sublease the facility.

84. The new proposed sub-lessee was VGM Management, Inc. and the process was modeled after the VEF sub-lease (that existed before ElderCare took over the Lease) to avoid direct liability.

85. During the time that VGM Management, Inc. took over operations of the Lease, ElderCare acquired policies to pay defense costs.

86. A sub-lease between ELDERCARE and VGM Management was executed in April of 2003.

87. When the sub-lease took effect, ElderCare believed it no longer had an insurable risk of operations, and it canceled the insurance policies, having only a few remaining months on the policies.

88. ElderCare did not seek any consent of VEF for the sub-lease arrangement.

89. VEF took no action to treat the sub-lease as a breach of the Lease.

90. From 2003 to 2005, ElderCare made numerous efforts to find other sources of liability insurance.

91. Substantial communications occurred between ElderCare and its insurance agents in an effort to obtain liability insurance coverage during the years 2003, 2004, 2005.

92. During the years 2004 and 2005, it was not possible to get liability coverage required by the Lease.

93. On January 3, 2005, ElderCare furnished evidence of its commercial general liability insurance to VEF but in an amount less than the Lease required, and did not furnish any malpractice insurance.

94. During May of 2005, a new market for insurance coverage offered a quote for professional liability coverage in the amount of $1,000,000.00 per occurrence and $4,000,000.00 aggregate for approximately $25,000.00 per year. Mr. Hamel ordered Mr. Montgomery to bind the policy which became effective July 6, 2005.

95. Once insurance coverage became available to ElderCare in early July, 2005, operations and management were returned to ElderCare, the sub-lease canceled; and ElderCare assumed all operations, effective August 1, 2005.

### G.   Insurance Request to Renegotiate

96. The Lease contains the following provisions related to liability insurance:

6.07   Claims for personal injury or property damage under a policy of general public liability insurance with amount of not less than Five Million and No/100 Dollars ($5,000,000,000.00) per occurrence in respect of bodily injury and One Million and No/100 Dollars ($1,000,000,000.00) for property damage.

6.08   Claims arising out of malpractice in an amount no less than Four Million and No/100 Dollars ($4,000,000,000.00) for each person and for each occurrence.

6.16   In the event that either party shall at any time deem the limits of the personal injury or property damage public liability insurance then carried to be either excessive or insufficient, the parties shall endeavor to agree on the proper and reasonable limits for such insurance to be carried, and such insurance shall thereafter be carried with the limits thus agreed on until further change pursuant to the provisions of this Article.  If the parties shall be unable to agree thereon, the proper and reasonable limits for such insurance to be carried shall be determined by a mediator jointly selected by Lessee and Lessor, provided however that the terms of the underlying Base Lease shall control the minimum insurance requirements which Lessee is required to provide hereunder.

97. The term "general public liability insurance" used in 6.07 is not a known "term of art" or an industry recognized term in the insurance industry.

98. The term "personal injury or property damage public liability insurance"

used in 6.16 is not a known "term of art" or an industry recognized term.

99. Provision 6.16 is ambiguous as to whether professional liability insurance is subject to renegotiation if the limits become excessive or insufficient.

100. VEF and ElderCare intended for the Lease to allow the parties to change the insurance limits for professional liability insurance and commercial general liability insurance in the event that the limits then carried became excessive or insufficient.

101. VEF and ElderCare intended to allow the parties to go to mediation to determine the limits of insurance for professional liability insurance and commercial general liability insurance where the mediator will make the determination as to the limits under the policies.

102. During the summer of 2004, ElderCare invoked the provisions of the Lease found in 6.16 and requested that VEF modify the insurance limits so that Elder-Care could obtain coverage.

103. During this time, ElderCare had communications with VEF concerning the insurance problem and the inability to obtain malpractice insurance and made a presentation to the Board in August of 2004 concerning the difficulty in obtaining insurance.

104. At the Board meeting, Glen Hamel requested that the Board enter into negotiations to reduce the amount of coverage and negotiate the insurance provisions, but no action was taken by the Board.

105. After Mr. Hamel requested renegotiation of the professional liability insurance limits, members of VEF's Board, including Sue Hayes, Jerry Tochterman, and Steve Charlton told the Board that it was very difficult to obtain professional liability insurance and very expensive.

106. Instead of agreeing to re-negotiate the malpractice insurance requirements of the Lease, VEF notified Elder-Care of the potential breach of the Lease for failure to obtain insurance under the Lease and VEF thereafter repeatedly extended the time to acquire the insurance.

107. Although it did not complain about the coverage amounts provided from 2000–2004, VEF did not agree to reduce the amount of insurance coverage for 2004–2005 malpractice insurance, but VEF agreed to continue the discussions about the possible reduction.

108. ElderCare relied upon the fact that the discussions and negotiations with VEF with respect to reducing the insurance limits were continuing and ongoing until the time it received the notice of termination letter in June of 2005.

109. VEF breached its obligation to negotiate a reduction in the insurance limits when the insurance limits became excessive.

110. The Court finds that it is likely that ElderCare can comply with any negotiated or mediated insurance provisions.

## H. The January 11, 2005, Letter and Subsequent Termination

111. The January 11, 2005, Notice Letter is the only notice that VEF relies upon for its position that its purported termination letter, given five months later, operated under the contract and the common law of Texas to terminate the Lease.

112. The January 11, 2005 letter ends with the statement that "ElderCare, Inc. will need to respond to this letter by _____."

113. The January 11, 2005, letter does not state a date as to when ElderCare, Inc. needs to respond to the letter, or a

date when ElderCare needs to respond to the reference to insurance defaults.

114. The January 11, 2005, letter does not suggest termination, mention termination, or imply that a 30–day time period will commence resulting in termination of the Lease.

115. The January 11, 2005, letter does not make demand for performance upon ElderCare.

116. The January 11, 2005, letter includes an invitation to re-negotiate the insurance issues:

> If you want to ask the Board for possible reconsideration for the Lease insurance requirements, ElderCare, Inc. will need to submit letters of denial of coverage and copies of quotes on insurance that make it cost prohibitive, on or before January 21, 2005.

117. By the letter of January 11, 2005, VEF intended to request evidence that ElderCare was not offered a coverage policy and proof of the cost of insurance.

118. ElderCare provided oral information to VEF about the state of the liability insurance market beginning in the summer of 2004 going through June 2005 when VEF purportedly terminated the Lease.

119. ElderCare actively and diligently searched for liability insurance coverage including professional liability insurance coverage from 2003 through June 2005.

120. After receiving the January 11, 2005, letter and invitation to continue to negotiate the insurance issue, Glen Hamel scheduled a meeting with Errol Eder who was the acting vice-president of VEF.

121. The meeting took place on January 19, 2005, and Mr. Hamel and Mr. Eder discussed ElderCare's request for more time and to deal with and document the changing insurance market and as well as changing the insurance requirements under the Lease.

122. Mr. Glen Hamel followed up the meeting by sending an email to Errol Eder the next week as follows:

> "As we discussed there as been a sea of changes in the mal-practice/professional liability insurance markets over the last few years. As I promised at our meeting, I have asked our insurance carrier to provide an outline of these changes and how it has effected Valley Grande manor."

123. The January 19, 2005, email goes on to state:

> I am seeking a way by which Valley Grande Manor can procure professional liability in accordance to the spirit of the Lease between VEF and VGM.

124. At the January 19, 2005, meeting with Glen Hamel, Errol Eder on behalf of VEF agreed to indefinitely extend the deadline for ElderCare to obtain malpractice insurance coverage.

125. Neither Mr. Eder, nor anyone from VEF, responded to this email with any objection, clarification, or denial, as to the contents of the email or provide any notice that the Lease would terminate in approximately 20 days, and Mr. Eder responded to the email; "thanx for the update."

126. As of the January 27, 2005, and at all times proceeding the receipt of the purported termination letter in June 2005, ElderCare did not have an understanding that VEF intended to assert the right to terminate ElderCare's Lease within 30 days of the January 11,2005, Notice Letter.

127. On February 2, 2005, ElderCare again wrote Mr. Eder at VEF that "...

our insurance broker is working diligently on our professional liability coverage...."

128. Mr. Eder of VEF responded "Thanx for the update. I will forward this to John Page (the author of the January 11, 2005 Notice Letter)."

129. As of the February 17, 2005, Board meeting, no decision had been made to terminate ElderCare's Lease, and thus, the January 11, 2005, Notice letter could not have been intended to notify Elder-Care of termination on the 30th day.

130. On March 1, 2005, Mr. Hamel provided Mr. Eder with the reports on progress in obtaining information by furnishing copies of two letters that he received from his insurance agents reflecting the work his agents were doing in attempting to find professional liability coverage, but these letters were not given to the Board, nor was the Board ever told of the letters.

131. These letters documented over a dozen insurance companies that were being contacted to provide the malpractice insurance and contained the information that ElderCare understood was to be furnished to VEF during this search period.

132. VEF did not respond to the transmittal of these letters from ElderCare's insurance agents but allowed ElderCare to continue to believe that VEF was working with them on the insurance issue which is what ElderCare continued to believe.

133. By relying on the full contents of the January 11, 2005, letter and awaiting a "response" from VEF, the Debtor lost valuable rights to protect its leasehold estate from termination.

134. While ElderCare was still waiting on a response from VEF, VEF conducted a May 26, 2005 Board meeting at which the Board "voted to accept the proposal" of one of its directors. The Board also voted to terminate the Lease of ElderCare and seek eviction during the same time

period that ElderCare was still trying to obtain a professional liability policy.

135. The termination was not communicated to ElderCare by the Board and on June 10, 2005, ElderCare continued to furnish information about Medicaid reimbursement problems.

136. On June 10, 2005, VEF sent a letter to the Debtor purporting to terminate the Lease and requesting that the Debtor vacate and surrender the premises because the Debtor had failed to obtain malpractice liability insurance in the amount of $4,000,000.00 in coverage.

137. Prior to the termination letter of June 10, 2005, no "response" was ever given by VEF to the information and communications of ElderCare to VEF concerning insurance and no notice was given that the agreed "extension" of time to communicate and "negotiate" had expired.

138. Despite the notice letter, Elder-Care continued its efforts to obtain professional liability insurance and obtained a $1,000,000.00 per occurrence policy in June 2005.

### I. Lease Proposal from Potential New Tenants

139. While ElderCare was still the tenant under the Lease and while ElderCare believed that it was still negotiation a reduction in the professional liability insurance limits, VEF began the process of obtaining a new tenant for the facility. VEF's negotiations with prospective tenants demonstrated VEF's willingness to accept reduced insurance coverage.

### J. Assurances of Future Performance

140. ElderCare is not in monetary default under the Lease.

141. ElderCare is in non-monetary default under the Lease because it failed to provide insurance coverage.

142. The Debtor has not been delinquent in any rent payment under the Lease since inception of the Lease, nor at any time during this Chapter 11 case.

143. The Debtor's financial circumstances have improved in the year 2006 as a result of certain Medicare and Medicaid reimbursement allocations.

144. ElderCare can perform the financial obligations of the Lease at the Lease rate that now exists.

145. It is likely that the parties will agree to new insurance coverage or will receive new coverage limits though mediation.

## CONCLUSIONS OF LAW

### A. The Lease was not Terminated Pre–Petition

1. The January 11, 2005, letter from VEF to ElderCare did not make a demand for performance upon ElderCare.

2. The January 11, 2005, letter from VEF to ElderCare did not inform Elder-Care that the Lease may be terminated unless they took action to obtain insurance as called for by the Lease.

3. The January 11, 2005, letter from VEF to ElderCare was not sufficient under Texas common law to trigger the right to terminate the Lease with ElderCare.

4. The Lease with ElderCare has not been terminated and is still in full force and effect.

### B. The Insurance Provisions of the Lease should be Re–Negotiated by a Mediator

5. The parties intended the Lease to allow the limits of professional liability and/or malpractice insurance to be subject to change and binding mediation in the event that the limits became excessive or insufficient.

6. ElderCare has the right to have a mediator determine the insurance limits for general liability and professional liability malpractice insurance.

7. For the policy years of 2000–2001, 2001–2002, 2002–2003, and 2003–2004, VEF waived any right that it may have had to require liability insurance in the amounts called for by the Lease by accepting the amounts that were provided by ElderCare. The non-waiver provisions found in 13.06 and 14.12 of the Lease do not apply because the waivers were specific waivers rather than continuing viewers.

8. For the insurance policy year 2004–2005, VEF breached it agreement to negotiate the commercial general liability insurance and professional liability insurance limits when the insurance limits became excessive which breach excused performance on the part of ElderCare as to the insurance requirements under the Lease for the years 2004–2006.

9. VEF has not been damaged as a result of ElderCare's failure to provide insurance as called for by the Lease.

### C. The Lease is an Assumable Executory Contract.

10. ElderCare has the right to assume the Lease with VEF, and ElderCare can meet al legal requirements necessary to assume the Lease.

11. The Lease is an executory contract.

12. Pursuant to the Bankruptcy Court, ElderCare may assume the Lease as an executory contract if it (A) cures, or provides adequate assurance that it will promptly cure its defaults; (B) compensates, or provides adequate assurance that

it will promptly compensate for any actual pecuniary loss resulting from default; and provides adequate assurance of future performance under the Lease. 11 U.S.C. § 365(b)(1).

13. ElderCare is paying rent and has proven that it can continue to pay rent.

14. ElderCare's proposed Plan of Reorganization demonstrates a likelihood of ability to perform in the future.

15. It was not possible for ElderCare to get professional liability insurance coverage in the amount of $4,000,000.00 per occurrence during the years 2003, 2004, and 2005.

16. The Lease should be specifically enforced and is specifically enforceable as to the requirements that the liability insurance limits be renegotiated. ElderCare therefore demonstrated adequate assurance of future performance on the insurance coverage issue.

### D. VEF's Proof of Claim

 17. The component of the proof of claim dealing with a pre-petition promissory note owed by ElderCare to VEF is not in dispute in this case. The Debtor acknowledges it as due, owing and not disputed in its publicly-filed schedules in this case and therefore is estopped from taking a contrary position in these proceedings. Moreover, no testimony was offered by ElderCare that presents any factual or legal basis on which to deny the claims set forth in the proof of claim. Accordingly, the claim is presumptively valid, is not currently challenged by pleadings or by the evidence, and with respect to the note obligation, is the subject of judicial estoppel against the Debtor concerning the validity of the claim. Thus, the objection to VEF's proof of claim is overruled.

18. ElderCare failed to prove damages and its counterclaim for offset is therefore denied.

### E. Damages

19. Both ElderCare and VEF breached the Lease, but failed to prove damages or at best are entitled only to nominal damages for their mutual breaches. Accordingly, the parties should bear their own legal fees and expenses.

20. Any conclusion of law deemed to be a finding of fact shall be so deemed, and any finding of fact deemed to be a conclusion of law shall be so deemed.